Filed 7/8/16  D.F. v. Furlani CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| D.F., a Minor, etc., | D069358 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. DV041425) |
| BRANDY L. FURLANI, | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Ernest M. Gross, Commissioner.  Affirmed.

Dawn M. Dell'Acqua for Defendant and Appellant.

Boyd Law, Karie J. Boyd, Thomas D. Georgianna and Emiliza P. San Diego for Plaintiff and Respondent.

Defendant and appellant Brandy L. Furlani (Mother) appeals a domestic violence restraining order (DVRO) that restricts her contact with plaintiff and respondent D.F. (Child), her 8-year-old son with her former husband Edward Furlani (Father), and with

her other child and steprelatives.  (Fam. Code,[1] § 6200 et seq., the Domestic Violence

Prevention Act (DVPA).)  Father, who is also a protected person under the order,

represents Child in the proceedings as his guardian ad litem.  (Code Civ. Proc., § 374

[appointment of guardian ad litem for minor petitioner; assessment of respective interests

required].)  The order also includes custody and supervised visitation provisions, and all

parties are represented by counsel.

On appeal, Mother argues there were several procedural errors made during the

proceedings that caused her prejudice.  On the merits, Mother focuses upon a single

incident that gave rise to the filing of the petition and contends it could not, as a matter of

law, amount to emotional abuse of Child.  She further argues the trial court made

erroneous evidentiary rulings that were abuses of discretion, and based on her own

version of the evidence, she contends the court should properly have found only that the

petition was insufficiently supported to justify issuance of the requested relief.

The record substantially supports the issuance of the order, in the evidence

presented and the trial court's rulings that interpreted the applicable legal standards.  The

court's exercise of discretion in making its evidentiary and procedural rulings comported

with applicable legal principles and the court had a sufficient basis to conclude, from all

of the reported testimony, that Mother's conduct toward Child in recent months amounted

to harassment within the meaning of the DVPA.  (§ 6203, subd. (a)(4) [defining abuse as

domestic violence behavior that may be enjoined under § 6320]; § 6320, subd. (a)

---

[1]     All statutory references are to the Family Code unless noted.

2

[injunctive order may be issued to prevent "stalking, threatening . . . harassing, . . . disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members"].)  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We outline the facts found in the record in some detail because the opening and reply briefs somewhat misleadingly represent that the court's decision was based upon one isolated incident of a mother questioning her child, or upon the opinion of an inexperienced child welfare services (CWS) worker.  Under California Rules of Court, rule 8.204(a)(2)(C), an appellant's opening brief must provide a summary of significant facts limited to matters in the record on appeal.  (See *Brockey v. Moore* (2003) 107 Cal.App.4th 86, 96 [claim of insufficiency of the evidence may be waived through a failure to set forth material evidence on an issue].)  To the extent Mother's interrelated arguments challenge the sufficiency of the evidence produced on which the court's discretionary decisions were made, it is important to understand the entire picture presented by the record.

*A.  Child's Request for DVRO; July 13 and August 17, 2015 Hearings*

In the previous dissolution action between Mother and Father, numerous child custody and visitation issues were litigated.  In addition to Child, born in 2008, Mother and Father together have one daughter, two years younger.  Father also has a year-old son with his second wife (the stepmother).  Previously, Father obtained his own DVRO effective between January 2012 and January 2014, on the basis that Mother had been violent toward him.  (*Furlani v. Furlani* (Super Ct. San Diego County, 2011, No.

3

DS46614).)  Also, Child obtained his own temporary restraining order (TRO) against Mother in the same case in October 2012, but it does not appear that a permanent order was issued on behalf of Child in that case.  (*Furlani v. Furlani* (Super Ct. San Diego County, 2012, No. DS46614).)  During the period between the expiration of the previous protective order obtained by Father and the filing of the current proceedings, Mother had equal legal and physical custody of the two children, and exercised unsupervised visitation with them, with curbside pickup.

On June 26, 2015, Child filed his DVPA petition seeking a TRO, and it was granted.  Father had filed the petition in propria persona and was appointed guardian ad litem on behalf of Child.[2]  Father alleged that reports had recently been made to CWS that Mother had slapped Child in the face and pushed him down the stairs, and that he said he was afraid of her.  The family met with CWS workers June 24, and a voluntary safety plan was put in place, including Mother's supervised visitation with Child.  The family agreed to have a dinner meeting set up for the next day at a neutral location.  At the appointed time, Mother came to Father's house looking for the family and entered the front gated walkway area.  Mother found Child and used her phone to take videos of him while she asked him whether he was afraid of her, since she was concerned about the

---

[2]     Mother does not challenge the appointment of Father as guardian ad litem in this case.  However, she does argue that Father tried to present evidence on behalf of Child that was beyond his personal knowledge, and the court accordingly declined to accept some kind of supplemental affidavit Father tried to file.  Thus, the court was well aware of the potential conflicts presented by Father's appointment but it managed to avoid problems, by requiring Father to testify only as to his personal knowledge.

4

safety plan. Mother forcefully grabbed the daughter by the arm. Father forcefully pulled the children back and told her to leave, and the meeting ended.

Attached to Child's petition were numerous exhibits, including 2011 arrest reports on Mother for violating the previous orders in the earlier DVRO proceedings, and 2012 reports from the county family services department and CWS. The family continued to be involved with CWS from November 2012 through February 2013. The children were referred to and attended a therapeutic preschool in early 2013. On July 1, 2013, Mother brought the children to school late and they were refused entry by the preschool director, Nancy Pratt, whereupon Mother became confrontational and slammed the metal gate, injuring Ms. Pratt's arm.

In support of the petition, Father on behalf of Child stated that custody had reverted to a 50-50 timeshare in January 2015. Child went on to another school when he reached kindergarten, but the children's schools were not given copies of the new orders and Mother was not allowed to pick them up, causing incidents. School personnel called police for assistance in removing Mother from the premises. Although the petition represented that police reports would be submitted, none was apparently provided to the court. The relief requested included changes in the current custody orders and stayaway orders from both children, Father's new son and the stepmother.

Mother filed a response to the petition, which has been added to our record through augmentation. She stated that the children were out in the walkway area when she arrived that day, and they were going in and out and having various problems and arguments. Mother overheard Father having a phone conversation with the stepmother,

5

telling her he was going to file for an ex parte order tomorrow. Mother got upset and started filming Child with her cell phone while she asked him whether he was afraid of her. Father came out of the house to pull the children inside, and she left. She objected that the petition was using photographs and documents going back two to three years, which had already been addressed by the court or child protective services, so she could not address them all, but would do so if requested.

At the initial hearing on the petition on July 13, 2015, counsel appeared for all parties, telling the court that there was a pending CWS investigation and a safety plan. Father's attorney requested a two-week continuance as he had just been hired and received the file, but the court denied it and proceeded. Father was sworn in as a witness and his attorney requested that he be able to testify on behalf of Child, as his guardian ad litem. The court denied the request and said Father could only testify as to his own firsthand knowledge, but not as to what Child told him. Father then testified he had been told by a babysitter that Mother had slapped and pushed Child down the stairs the previous month, but he did not find out about it until later. The court noted that the petition did not mention that previous incident by date and that particular evidence was unclear. Father then testified about Mother coming to the house on June 25, 2015, grabbing the children and scaring them.

Father also testified that CWS had been called into a doctor's office in October 2012, because Child had a bruise on his face and had told the doctor he had been hit in the face. Father took a picture at the time and it was admitted into evidence at the hearing. The court also admitted into evidence a picture of an injury that Child had to

his eye in May 2013, and a July 2013 minor burn on Child's arm, both received while he was in Mother's care.

Mother's attorney objected that the petition was very lengthy and she did not have time to respond to all the allegations. The court noted that the petition had not been set as a contested evidentiary matter, the CWS investigation was still pending, and the matter was too complicated to be decided that day. It ordered that the temporary DVRO be reissued, with Mother to be allowed professionally supervised visitation until the next hearing, set for August 17, 2015. Although counsel expressed some objections to the delay, they acknowledged that the matter was not ready for decision.

At the next hearing, the court took testimony from the CWS worker, Liliana Lopez Salgado, and received her July 28, 2015 letter to the court stating that the allegations of emotional abuse were substantiated and the case was being closed. She explained the physical abuse allegations were not sustained. In support of her letter, she had interviewed both parents and children, the maternal grandparents and the therapist. Child told her that he was afraid of his mother and had nightmares, and he drew pictures of what his mom had done to him, slapping him in the face and with an iPad. Salgado thought Child seemed to be acting very nervous while she was talking to him (picking at his skin and scabs). She concluded Child had been emotionally abused because he repeatedly expressed fears.

The court heard testimony from the children's 2013 preschool teacher, Nancy Pratt. She described the July 1, 2013 incident in which Mother and the children arrived late at school and insisted on being let in at the locked gate, but when Pratt tried to open it

for them, Mother grabbed the chain link fence and slammed Pratt's arm into the gate while screaming profanities at her, in front of the children. Child told Pratt during the summer of 2013 that his mother hit him in the face with her iPad. Although the children's therapist, Dr. Roderick Hall, was originally scheduled to testify, Father withdrew the request when the doctor pointed out that it could jeopardize the therapeutic relationship if he did so.

Father presented more testimony about finding marks or bruises on Child's face in May 2015 and other times within the last year, after he had been with Mother. Child was also having conflict with a schoolmate. Father's adult friend, whose son was a friend of Child, testified that he had been at the house in the morning and witnessed Child waking up with his hands in front of him saying "No, mommy. No, mommy. No." The friend observed that Mother did not supervise Child closely, such as when he ran out in the street and the friend's car almost hit him.

At that point, the court noted that the half-day hearing was almost over and there was more testimony to be presented from both parents, and based on counsel's estimates, another two-hour hearing was going to be required. Counsel discussed their schedules and availability and the court settled on September 21 as the next two-hour block available, due in part to the court's press of business and training requirements. The court reissued the temporary orders and continued the supervised visitation arrangement.

### B. September 21, 2015 Hearing and Ruling

At the beginning of the final hearing, Child's counsel noted that not all of the photographic evidence had been admitted into evidence yet, but the clerk clarified that

8

exhibits 1 through 3 had been admitted. More pictures of Child were submitted but the record does not show whether they were admitted. Father continued to testify about the marks he found on Child's face at various times, and the June 25 incident when Mother came to the house. Father admitted that between March 2013 and February 2014, his own visitation with the children was supervised. Another of Father's male friends testified that he was familiar with the children and Child had nervous tendencies.

The court took judicial notice of the earlier DVRO file regarding the 2012 order that had been issued for Father, in which Child was a protected party, although the copy of the order submitted was incomplete.

During Mother's testimony, she described incidents at school from January to March 2015, in which she supplied unsigned minute orders that the school did not accept on custody, which interfered with her efforts to pick up the children. She offered into evidence the three videos taken with her cell phone during the June 25 incident, and the court watched the videos and admitted them. Mother described the June 25 incident and said she went there to see if Father needed help getting things ready, and she didn't think there would be a problem. Mother explained the iPad incident as only a misunderstanding involving a neighbor child. Mother testified that many of the photographs Father was submitting were from previous legal proceedings, and she explained that a March 2013 child services report had some errors in it. The maternal grandmother testified about the 2013 iPad incident and explained it was caused by a neighbor child, and Mother had notified Father about how it happened right away.

The court heard argument and determined that the evidence presented by Child had demonstrated, by a preponderance, that Child had suffered substantial emotional abuse from his mother's treatment. The most compelling or convincing evidence to the court was that provided by the CWS worker, Salgado, who had interviewed the parents, the children, the maternal grandparents, and Dr. Hall, and thus had a basis to form her conclusions. The other thing that stood out to the court, from the testimony, was that Mother does not take no for an answer, but instead goes on the offensive. She had put Child in the most difficult situation possible by demanding that Child answer her questions that day, so that he was being inappropriately required to appease his mother. The court cited to "section 6320, subdivision (d)" (erroneously; that section has only subds. (a)-(c)), and then continued the restraining order for a period of a year. Mother was ordered to attend 52 weeks of domestic violence treatment. She appeals.

## DISCUSSION

Mother contends the court failed to afford statutory priority by continuing the hearings, and it also cited to the wrong authority in making its decision. Chiefly, Mother argues that asking Child if he was afraid of her could not constitute emotional abuse under the DVPA. Further, she attacks the CWS worker's opinion as unsubstantiated by the evidence. In response, Child argues that the family court acted well within its discretion and in compliance with the evidence when it issued the restraining order. We set forth applicable standards of review for assessing these positions.

10

# I

## *REVIEW AND STATUTORY SCHEME*

Generally, a trial court is granted broad discretion in determining whether to grant a petition for a DVRO under this statutory scheme. (§ 6345, subd. (a) [duration]; *Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420 (*Gonzalez*); *Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1505 (*Loeffler*).) The DVPA permits a court, upon a showing of "reasonable proof of a past act or acts of abuse," to issue a protective order restraining any person from contact, for the purpose of preventing a recurrence of domestic violence. (§§ 6220, 6300; *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1264.) "Abuse" in this domestic violence context may, under section 6203, subdivision (a)(4), include engaging "in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a)(4).) Those include "stalking, threatening . . . harassing . . . , contacting, either directly or indirectly . . . coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members." (§ 6320, subd. (a).)

Abuse, even if nonviolent, may warrant the issuance or renewal of such a protective order. (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1495-1496 (*Nadkarni*); § 6345.) "[S]ection 6320 broadly provides that 'disturbing the peace of the other party' constitutes abuse . . . ." (*Nadkarni, supra,* at p. 1497.) "[T]he plain meaning of the phrase 'disturbing the peace of the other party' in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party." (*Nadkarni, supra,* at p. 1497.) To obtain such an order, a protected party has the burden

11

to show by a preponderance of the evidence that a reasonable person would have a " 'reasonable apprehension' " of future abuse. (*Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1290.)

On review, we consider whether the trial court abused its discretion, such as when it has failed to apply correct legal standards and thereby acted outside the confines of the applicable principles of law, or without substantial support in the evidence. (*Gonzalez, supra,* 156 Cal.App.4th 413, 420-421.) As a trier of fact, the trial judge is required to reject evidence only " 'when it is inherently improbable or incredible, i.e., " 'unbelievable *per se*,' " physically impossible or " 'wholly unacceptable to reasonable minds.' " ' " (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.)

On appeal, we do not reweigh the evidence or second guess the credibility of a witness. (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531 (*Balcof*).) In determining whether substantial evidence supports the court's order, we view the evidence in the light most favorable to the order. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151.)

II

*ANALYSIS*

A. Conduct and Continuances of Hearings

Mother first complains that the court misapplied the statutory preference for priority for the hearings on the petition. Section 242 anticipates that the hearing on the petition shall take place within 21-25 days from the date that the TRO is granted or denied, and provides that the court may extend the effective date of the TRO if

12

appropriate. Under section 244, the matter shall take precedence over all other nonpriority cases. The constitutional principle of "[d]ue process guarantees ' "notice and opportunity for hearing appropriate to the nature of the case." ' " (*In re Jesusa V.* (2004) 32 Cal.4th 588, 601; italics omitted.)

Mother objects that the TRO was reissued twice, adversely affecting her child custody rights, and the court's failure to give the case proper priority prejudiced her, when Child was allowed to subpoena and present additional witnesses in support of his case. She argues the only appropriate interpretation of preference would be to hold the original hearing day after day until it concludes. However, her position disregards the portions of the record in which her attorney reluctantly agreed to the continuances, in part because he was unavailable for an earlier September hearing.

Moreover, the court made express and implied findings of good cause for the continuances, because the CWS investigation was continuing and the matter was too complex for a single hearing. We cannot fault the court for managing its calendar and exercising its discretion to ensure that each party had the opportunity for hearings on the merits that were appropriate to the individualized nature of the case. (*In re Jesusa V.*, *supra*, 32 Cal.4th 588, 601.)

Further, Mother cannot show there was any harmful error or failure to apply appropriate statutory principles, merely because the court's oral ruling referred to a subdivision of section 6320 that does not exist, i.e., its subdivision (d) (or if there were a mistake in the record provided by the court reporter). (See *Sabato v. Brooks* (2015) 242 Cal.App.4th 715, 724-725 [no reversal for ordinary error without a showing of

13

miscarriage of justice].) In all the relevant respects, the court showed it was cognizant of the applicable legal principles and it applied existing law to the facts as established at the hearing. (§ 6203, subd. (a)(4); § 6320, subd. (a).)

B. Respective Showings on Emotional Abuse; Witness Credibility

Mother next contends that Child failed to carry his burden to show, by a preponderance of the evidence, that her conduct amounted to emotional abuse within the meaning of the statutory scheme. She argues that much of Child's evidence duplicated earlier filings in litigation between the spouses, or it was too remote in time to be relevant (e.g., the 2013 incident at the children's school testified to by Pratt). Mother continues to argue that the incident that precipitated the filing of the petition, the June 25 confrontation at Father's house, was given too much weight by the court, and it could alternatively be interpreted as not amounting to emotional abuse.

Along the same lines, Mother argues that the trial court could not properly have given significant weight to the testimony by the CWS worker, Salgado, because she had been on the job for only about a year and did not testify forcefully about her interpretation of symptoms of emotional abuse, such as explaining more about her observations of Child's nervousness during her interviews with him. Although Mother concedes that the trial court has the discretion to make evidentiary rulings and to weigh the evidence, she argues that discretion must have been abused here and/or no substantial evidence supports the findings.

The exact language of the DVPA statutes should be broadly construed in order to accomplish the purpose of the legislation. (*Altafulla v. Ervin* (2015) 238 Cal.App.4th

14

571, 579.) In interpreting its provisions, the court was required to exercise authority to issue necessary orders that were suited to the individual circumstances of the parties. Emotional abuse can take many forms and the statutes could not reasonably be designed to define each and every one of them. (*Ibid.*)

The evidence, including admissions by Mother, showed that during a period of at least several months, Mother carried out several types of actions that could reasonably interpreted as disturbing the peace of mind of Child and the protected persons. (*Nadkarni*, *supra*, 173 Cal.App.4th 1483, 1495-1497.) There was testimony about the July 2013 confrontation at the school. Further, Mother testified about similar problems after the 50-50 custody arrangement was restored in January 2015, when she supplied unsigned minute orders that the school did not accept on custody, even though she felt they were okay, and this interfered with her picking up the children. Thus, evidence about more conflict-ridden incidents than just the June 25 encounter at Father's house was presented to the court, supporting its finding that in this context, Mother inappropriately sometimes will not take "no" for an answer. Moreover, Mother's explanation for why and how she approached Father's house and engaged the children was evidently not accepted by the trial court, after it viewed the videos she offered into evidence. The court had a sufficient basis to find that " 'disturbing the peace of the other party' " occurred here and amounted to abuse for purposes of the DVPA. (*Nadkarni*, *supra*, at pp. 1495-1497; § 6320, subd. (a).)

To the extent Mother complains that the CWS worker could have presented more convincing testimony, Mother is disregarding the contextual testimony and evidence

15

(letter to the court) that the worker conducted numerous interviews of the affected parties, several times each over a period of many weeks, and that the agency did not conclude the case until the investigation was deemed complete by the worker and her supervisors. Mother cannot properly ask this court to reweigh the evidence on appeal or reevaluate witness credibility. (*Balcof*, *supra*, 141 Cal.App.4th 1509, 1531.)

We examine the trial court's granting of the protective order for abuse of discretion, with attention to the particular law being applied by the court. (*S.M. v. E.P.*, *supra*, 184 Cal.App.4th 1249, 1264-1265; *Gonzalez*, *supra*, 156 Cal.App.4th at pp. 420-421.) From the reporter's transcript, it is evident that the judicial officer who heard the case examined the merits of the petition and Mother's opposition, and conscientiously gave both sides a chance to be heard. The record fully supports Child's request for injunctive relief arising from the dysfunctional interactions between Mother, the children, and Father, up to and including the June 25 incident. Absent an indication to the contrary, we are required to presume the trial court applied the correct legal standards in making its discretionary determinations. (*In re Angel L.* (2008) 159 Cal.App.4th 1127, 1136-1137; *Gonzales, supra*, 156 Cal.App.4th at pp. 420-421.) There is no basis in the record to show the court abused its discretion in evaluating the evidence and arriving at its order.

DISPOSITION

The order is affirmed.  Costs are awarded to Respondent.


                                                    _____
                                                         HUFFMAN, Acting P. J.

WE CONCUR:



_____
        HALLER, J.



_____
        O'ROURKE, J.




17